2007 ME 87

**STATE of Maine**

v.

**Frank J. DION.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 2, 2007.

Decided: July 12, 2007.

Norman R. Croteau, District Attorney, Deborah Potter Cashman, Asst. Dist. Atty., Auburn, for State.

Peter E. Rodway, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.

MEAD, J.

[¶ 1] Frank J. Dion appeals from a judgment of conviction entered in the Superior Court (Androscoggin County, *Gorman, J.*) on his conditional guilty pleas for gross sexual assault (Class A), 17–A M.R.S. § 253(1)(C) (2006); unlawful sexual contact (Class B), 17–A M.R.S. § 255–A(1)(E–1) (2006); and sexual misconduct with a child under twelve years of age (Class C), 17 A M.R.S. § 258(1–A) (2006).[1] Dion contends

---

1. Rule 11(a)(2) of the Maine Rules of Criminal Procedure provides for conditional pleas of guilty only and does not authorize the entry of a conditional plea of nolo contendere. The parties have not raised or argued this point. Accordingly, we treat the defendant's plea as

that the court erred in denying his motion to suppress statements he made to the police because (A) he was not advised of his *Miranda* rights prior to custodial interrogation, and (B) his statements were involuntary. We disagree and affirm the judgment of conviction.

## I. BACKGROUND

[¶ 2] On October 2, 2005, Deputy Travis Lovering and another uniformed officer of the Androscoggin County Sheriff's Department traveled to the residence of Rebecca Hinkley in Leeds to investigate a reported assault of Hinkley's three-year-old daughter. During discussions with the victim and her mother, they learned that the victim had spent the previous night with a neighbor, Frank Dion, who lived across the street. The victim indicated to the officers that she had touched Dion's genitals, that Dion had touched her genitals, and that Dion had shown her pornography. Deputy Lovering then requested the assistance of Detective Sergeant William Gagne of the Androscoggin County Sheriff's Department who arrived on the scene shortly thereafter.

[¶ 3] Lovering and Gagne crossed the street to Dion's home. Their intention was to speak with Dion to see if he would talk about the incident. The officers had not made any decisions about arrests at that time. The officers were uniformed and had parked in front of Dion's house.

[¶ 4] The officers knocked on Dion's front door, and one of Dion's children answered, quickly followed by Dion. Dion had seen the police across the street at the Hinkleys' home. When the officers asked Dion where he would be most comfortable speaking with them, Dion replied that the front steps of his house would be acceptable. At the beginning of the conversa-

tion, Dion instructed his children to go inside the house.

[¶ 5] The officers informed Dion that they were investigating a reported incident with the victim. At first, Dion denied any knowledge of the incident, but later told the police that the victim walked in on him while he was masturbating.

[¶ 6] The tone of the discussion was conversational, and the officers remained calm and polite. The officers never told Dion that he was not free to leave or that he was required to speak to them. At no point during the conversation did the officers place Dion in handcuffs or restrain him in any fashion. The officers never drew their guns.

[¶ 7] During the course of the interview, Lovering repeatedly told Dion that Lovering "knew what happened," and that it was in Dion's best interest to explain whatever happened in his own words. Lovering encouraged Dion to "be a man about it."

[¶ 8] About three minutes into the conversation, Dion stated that he had been looking at pornography on his computer while the children played in another room. The officers told Dion that the victim's account of the incident greatly differed from his. They again told him that it would be in his best interest to tell the truth, and encouraged him to say exactly what happened.

[¶ 9] About ten minutes into the conversation, the officers asked Dion if he wanted to go into his house so they would not be in the presence of Dion's girlfriend, but Dion expressed his preference to stay on the front steps. Lovering asked Dion if the victim had seen any pornography, which Dion denied. Lovering told Dion that "a three year old doesn't make up stories like that and to be able to explain

---

*subject to the provisions of Rule 11(a)(2) sole-* ly for purposes of this case.

every detail like she did to me .... I know you're lying and what I want you to do i[s] to tell me the truth." Dion then told the officers that he showed the victim pornography while she was sitting in his lap.

[¶ 10] The officers once again told Dion that they knew exactly what happened, but they stated they were willing "to give him the option" to explain what happened in his own words, because "it would actually look better for you to come out and say, 'You know what, I really messed up this morning a little bit.'" Dion then told them that he exposed his genitals to the victim for a couple of minutes.

[¶ 11] After conversing for about twenty minutes, the officers reminded Dion that they had spoken to the victim, and that they knew there was more to it than what he was telling them. They told Dion that they were giving him the chance to say what happened and to get it off of his chest, but the decision was up to him. After a long pause, Dion told the officers "I take it I'm under arrest, right." The officers told him that he was not under arrest. After another long pause, Dion admitted that the victim had touched his genitals, and he had touched the victim's genitals.

[¶ 12] About twenty-nine minutes into the conversation, after describing the sexual touching, Dion asked if he could smoke a cigarette. Lovering reminded Dion that it was his house, and he could do whatever he wanted. Dion called to his girlfriend and his son to retrieve his cigarettes, and the officers told him that he could go up to the door because it was his house. Dion then smoked the cigarettes outside.

[¶ 13] Dion then told Lovering that he had performed oral sex on the victim.[2]

Lovering then asked Dion to prepare a written statement describing the prior events. Dion agreed. Dion made the statements noted above within the first thirty-five minutes of questioning.

[¶ 14] After Dion had signed a written statement, Gagne asked Dion if he wished to explain to his girlfriend, who was still in the home, the nature of his discussion with the officers. Dion told his girlfriend that he had touched the victim. At no time during the conversation did the officers remind Dion of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[¶ 15] At the conclusion of the interview, the officers arrested Dion.[3] Dion was charged by indictment with gross sexual assault (Class A), 17–A M.R.S. § 253(1)(C), unlawful sexual contact (Class B), 17–A M.R.S. § 255–A(1)(E–1); and;sexual misconduct with a child under twelve years of age (Class C), 17–A M.R.S. § 258(1–A).

[¶ 16] Dion filed a motion to suppress his statements to the police, arguing that he made involuntary statements in custodial interrogation without having been advised of his *Miranda* rights. A two-day suppression hearing was held in August 2006. At the hearing, Dion testified that he felt he had to talk to the police when they came to his house, and that he did not believe he was able to terminate the interview and walk away. Dion testified that he thought he was under arrest the whole time, even after the officers told him he was not. Dion based these feelings largely on the tone and physical presentation of the officers.

[¶ 17] The court denied Dion's motion to suppress. The court found that no *Mi-*

---

2. The victim had not told Lovering that Dion had performed oral sex.

3. The conversation was secretly taped by the officers. The total taped conversation was one hour and twenty-one minutes.

*randa* warnings were required because Dion was not in custodial interrogation at the time of the conversation. The court concluded that no reasonable person in Dion's position would have believed he was in police custody, or constrained to any degree. The court also concluded that Dion made his statements voluntarily, and that the confession was not based on a promise of leniency, because the officers made no promises.

[¶ 18] Pursuant to M.R.Crim. P. 11, Dion filed conditional guilty pleas to all three charges, and filed this timely appeal. For the gross sexual assault charge, Dion was sentenced to fifteen years imprisonment, with all but five years and one day suspended, and eight years of probation. For the unlawful sexual contact charge, Dion was sentenced to five years and one day. For the charge of sexual misconduct with a child under twelve, Dion was sentenced to five years. All sentences were to be served concurrently.

## II. DISCUSSION

[¶ 19] We address in turn Dion's contentions that his statements must be suppressed because (A) he made his incriminating statements while in police custody without being advised of his *Miranda* rights, or (B) he made his statements involuntarily.

### A. Whether Dion Made his Statements While in Police Custody

[¶ 20] Dion argues that he was in de facto police custody at the time he made his statements, and that the statements must be suppressed because he was never given *Miranda* warnings. He argues that he reasonably believed that he was in custody because: (1) the police initiated the contact; (2) the police implied that there was probable cause to arrest him; (3) the police manifested their subjective beliefs

that Dion had committed the crime; (4) Dion manifested to the police his belief that he was under arrest; (5) the focus of the investigation was that Dion had committed a gross sexual assault; and (6) the conversation was lengthy.

[¶ 21] A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in order for statements made during the interrogation to be admissible against him or her at trial. *State v. Bridges,* 2003 ME 103, ¶ 23, 829 A.2d 247, 254. "[A] *Miranda* warning is necessary only if a defendant is: (1) in custody; and (2) subject to interrogation." *State v. Higgins,* 2002 ME 77, ¶ 12, 796 A.2d 50, 54 (citation and quotation marks omitted).

[¶ 22] We view a decision on whether a person was in custody as a mixed question of fact and law. *Bridges,* 2003 ME 103, ¶ 25, 829 A.2d at 254. "We give deference to the trial court's factual determinations, but the determination of whether an individual was in custody requires an independent *de novo* review." *Id.*

[¶ 23] A person not subject to formal arrest may be "in custody" if "a reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave" or if there was a "restraint on freedom of movement of the degree associated with a formal arrest." *State v. Holloway,* 2000 ME 172, ¶ 14, 760 A.2d 223, 228 (citation and quotation marks omitted). This test is an objective one, and we have stated that in analyzing whether a defendant is in custody, a court may consider the following factors:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. Michaud,* 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226. These factors are viewed in their totality, not in isolation. *Holloway,* 2000 ME 172, ¶ 19, 760 A.2d at 229.

[¶ 24] The court did not err in denying Dion's motion to suppress because the totality of the above factors support the trial court's conclusion that Dion was not in police custody when he made incriminating statements.

[¶ 25] Dion made the statements at his own home. He chose that the conversation occur on his front porch, out in the open. At the beginning of the conversation, the officers believed that they did not have probable cause to arrest Dion because the allegation of contact had come from a three-year-old. Although they must have developed probable cause to arrest Dion at some point, they never indicated to Dion that they had probable cause to arrest him.

[¶ 26] Although the officers initiated the contact with Dion, their behavior and statements gave Dion little reason to believe that he was not free to leave. They never denied a request from Dion that the conversation end and did not interfere with the ability of Dion's girlfriend and children to interact with him. To the contrary, the officers reminded Dion throughout the conversation that he could do as he wished because he was at his own home. In addition, although the officers said that they "knew what happened," they never told Dion exactly what the victim had alleged. The officers' behavior would not cause a reasonable person in Dion's position to believe he was not free to leave or terminate the conversation.

[¶ 27] Furthermore, Dion's behavior suggests that he subjectively knew he had control over the conversation. At the beginning of the conversation, Dion directed his children to go back inside the house. Even after Dion began to discuss some of the sexual contact between himself and the victim, Dion made the decision to stay out on the front steps, contrary to the officer's suggestion that they move inside.

[¶ 28] The trial court found that Dion's testimony that he believed he was under arrest or not free to leave was not credible based on his demeanor at the motion hearing. When Dion asked the officers if he was under arrest, they unequivocally told him he was not. The officers also reminded Dion that he could do as he wished in his home. Admittedly, Dion was the clear focus of the investigation, but he was questioned on his own front porch with only two officers present. He was never physically restrained.

[¶ 29] Like *Higgins,* our most recent decision concluding that an interrogation was non-custodial, Dion's "demeanor and conduct throughout his interrogation manifested a desire to cooperate and answer the detectives' questions" and the detectives were "conversational and non-confrontational." 2002 ME 77, ¶ 18, 796 A.2d at 56. In fact, Dion's questioning was conducted under circumstances which were notably less oppressive than those in *Higgins.* In *Higgins,* there were at least five officers present during the questioning, although only two in the room with Higgins at any one time. *Id.* ¶¶ 5–6, 14, 796 A.2d at 52–53, 55. In the present case there were only two officers involved in Dion's questioning. In *Higgins,* the questioning took place on the second floor of a fire station; in the present case, the questioning occurred in the familiar setting of Dion's front steps. *Id.* ¶ 6, 796 A.2d at 53. Higgins made his most incriminating statements approximately three hours into the questioning; in the present case, a full confession was reached in thirty-five minutes. *Id.* The questioning of Dion was more congenial and low-key than the interrogation of Higgins.

[¶ 30] The procedures used in the present case were within the established parameters of non-custodial questioning. Dion's statements made without *Miranda* warnings need not be suppressed.

B. Whether the Confession was Involuntary

[¶ 31] Dion argues that his statements were made involuntarily and therefore cannot be admitted at trial. He contends that statements from the officers that they knew what had happened and that Dion should "be a man," combined with an implied promise of leniency if he confessed, made his statements involuntary.

[¶ 32] The determination of whether a confession is voluntary is a mixed question of fact and law; a court's factual findings are reviewed deferentially for clear error, but the application of legal principles to those findings is reviewed *de novo. State v. Coombs,* 1998 ME 1, ¶¶ 7–8, 704 A.2d 387, 389–90. "The suppression judge must consider the totality of the circumstances in determining whether a confession is voluntary." *Id.* ¶ 7, 704 A.2d at 389.

[¶ 33] A confession is admissible in evidence only if it is voluntary; the State bears the burden of proving voluntariness beyond a reasonable doubt. *State v. Sawyer,* 2001 ME 88, ¶ 8, 772 A.2d 1173, 1175. "In order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect." *State v. Rees,* 2000 ME 55, ¶ 3, 748 A.2d 976, 977 (quotation marks omitted). We have held that statements made in response to officer statements that "it would be better to tell us [the truth]" and that "people would think more of [the defendant] if he got it off his chest" were voluntary and not the product of a promise of leniency. *See State v. Theriault,* 425 A.2d 986, 990 (Me. 1981).

[¶ 34] In the present case, the court's finding that neither officer made a direct or implied promise of leniency in exchange for Dion's confessions was supported by the evidence. Lovering's statement that it would "look better" for Dion to confess did not constitute a promise of leniency and did not render Dion's statement involuntary. *See Theriault,* 425 A.2d at 990.

[¶ 35] Furthermore, the aforementioned factors that support the determination that Dion was not "in custody," also support the conclusion that Dion's statements were

a product of his "free will and rational intellect." *See Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d at 1176. The interview was conversational and cooperative, and the officers remained calm and polite. No physical force was used. In the totality, the court's factual findings relating to voluntariness are supported by the record, and the court properly concluded that those facts establish a voluntary confession.

The entry is:

Judgment affirmed.