2010 ME 37

**STATE of Maine**

**v.**

**Salvador T. POBLETE.**

Supreme Judicial Court of Maine.

Argued: Feb. 9, 2010.

Decided: April 27, 2010.

Steven C. Peterson, Esq. (orally), West Rockport, ME, for Salvador T. Poblete.

Geoffrey Rushlau, District Attorney (orally), Rockland, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1] Salvador T. Poblete appeals from a judgment of conviction of gross sexual assault (Class B), 17–A M.R.S. § 253(2)(H) (2009), entered in the Superior Court (Knox County, *Hjelm, J.*) following a jury trial. Poblete contends that the court (*Humphrey, C.J.*) erred in denying, in part, his motion to suppress statements he made to the police. Poblete also argues that: (1) the court-provided interpreter's translation services were inadequate and deprived him of a fair trial, and (2) the evidence presented at trial was insufficient to support his conviction. Except for an apparent error involving Poblete's sex offender registration, which can be corrected on remand, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the State, *see State v. Bickart*, 2009 ME 7, ¶ 46, 963 A.2d 183, 195, the jury rationally could have found the following facts beyond a reasonable doubt. Salvador Poblete was born in the Philippines in 1952. At age twenty-six, after completing high school and serving in the military, Poblete left the Philippines to work in Saudi Arabia. Although he spent a majority of the next several years in Saudi Arabia, Poblete continued to return to the Philippines, where he was married and had children. Poblete came to the United States in 1990, and spent nearly ten years in California before moving to Rockland and remarrying in 2000.

[¶ 3] Poblete and his ex-wife have three children; the youngest was born on August 8, 1988, and is the victim in this case. The victim, who did not meet Poblete until she was five years old, grew up in the Philippines with her mother and two older sisters. In February 2006, the victim moved to the United States to live with Poblete and his wife in Rockland.

[¶ 4] On or about June 3, 2006, during the course of the victim's stay in Rockland, Poblete engaged in sexual intercourse with the victim. Two days later, the victim left Rockland to join Penobscot Job Corps in Bangor. The victim continued to return to Poblete's apartment on weekends until she turned eighteen, after which she rarely visited. In early January 2007, the victim filed a complaint for protection from harassment against Poblete.

[¶ 5] On January 23, 2007, Detectives Russell Thompson and Christopher Young of the Rockland Police Department went to Poblete's apartment to investigate the complaint. Because Poblete was at work, the detectives spoke with Poblete's wife and explained to her their intention to discuss the victim's allegations with Poblete. The detectives left the apartment after approximately thirty minutes. Upon returning home from work that night, Poblete called Thompson's cell phone and left two messages.

[¶ 6] The following morning, Thompson called Poblete's wife to ask whether Poblete would come to the police station before work. No particular time was scheduled, and Poblete and his wife drove to the police station that afternoon, arriving at 4:05 p.m. Thompson and Young, both in plain clothes, came to the lobby to meet the couple and escorted Poblete to a small interview room approximately 200 feet from the lobby.[1]

[¶ 7] The interview room had one door, no windows, and was furnished with a small table, three chairs, and a phone on the table. The room was equipped with audio and video recording devices, which were activated without Poblete's knowledge while he was in the room. Upon

---

1. The detectives denied Poblete's wife's request to join Poblete in the interview room.

entering the room, Thompson told Poblete that he was closing the room's door for "privacy."

[¶ 8] Thompson began by advising Poblete that he did not have to speak and that he could stop the interview at any time. Poblete agreed to talk, and a discussion of the allegations contained in the harassment complaint ensued. Approximately thirty minutes into the discussion, Poblete asked to "call [his] wife." Although Young replied, "You can call anybody you want," Poblete's wife was never brought into the room. Instead, the detectives attempted to clarify why Poblete wanted to call his wife.

[¶ 9] Shortly after this exchange, Young asserted to Poblete that "something happened between [Poblete] and [the victim]." Young told Poblete to "start being honest with us and tell [ ] us what happened." After a long pause, Thompson said, "[T]ell us what happened, get it off your chest." For the next twelve minutes, Poblete explained his version of the allegations contained in the protection order.

[¶ 10] Nearly forty-five minutes into the interview, the detectives briefly left Poblete alone in the room. When the detectives returned, Young asked Poblete if he wanted a drink of water. Poblete answered, "Yeah, I'm thirsty," and asked to tell his wife that he was going to be late for work. Young left the room to speak with Poblete's wife, while Thompson remained and continued asking Poblete questions.

[¶ 11] At 5:04 p.m., Thompson told Poblete that "for [the victim] but more especially for you," Poblete needed to explain "what was really happening." Poblete responded, "That's what happened. I don't have nothing to say anymore. That's all." Undeterred, Thompson continued the questioning.

[¶ 12] When Young returned with Poblete's water, the two detectives expressed their disbelief regarding Poblete's story. Poblete continued to insist that he had nothing more to say, and, eventually, Young asked Poblete if he wanted to end the interview. Poblete answered in the affirmative, and the three men left the room. In total, the interview lasted approximately an hour. At no time did the detectives advise Poblete of the rights referred to in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

[¶ 13] On February 7, 2007, a criminal complaint was filed against Poblete in the Knox County Superior Court, alleging one count of gross sexual assault (Class B), 17–A M.R.S. § 253(2)(H). Poblete was subsequently arrested and charged, in a nineteen-count indictment, with ten counts (including the count alleged in the initial complaint) of gross sexual assault (Class B), 17–A M.R.S. § 253(2)(H); one count of unlawful sexual contact (Class B), 17–A M.R.S. § 255–A(1)(N) (2009); four counts of unlawful sexual contact (Class C), 17–A M.R.S. § 255–A(1)(M) (2009); three counts of incest (Class D), 17–A M.R.S. § 556(1)(A) (2009); and one count of unlawful sexual touching (Class D), 17–A M.R.S. § 260(1)(G)(2009).

[¶ 14] Poblete pleaded not guilty and filed several pre-trial motions, including a motion to suppress his statements to the police, arguing that he made involuntary statements in custodial interrogation without having been advised of his *Miranda* rights. At the suppression hearing, Poblete was provided with the assistance of an interpreter but did not testify.

[¶ 15] On January 30, 2008, the court entered an order granting in part and denying in part Poblete's motion to suppress. The court found that although Poblete's first language is Tagalog, he was able to communicate in English, and "re-

sponded appropriately in English" to all of the detectives' questions. The court further found that no *Miranda* warnings were required because Poblete was not in custody at the time of the interview. Regarding voluntariness, the court concluded that the State had failed to prove the voluntariness of statements made by Poblete "from and after [his] first statement that 'I don't have nothing [to say anymore],'" which occurred at approximately 5:04 p.m. The court determined that all earlier statements were voluntary, and suppressed only the statements made after 5:04 p.m.

[¶ 16] Poblete's jury trial began on December 3, 2008.[2] An interpreter assisted Poblete at trial, and the court (*Hjelm, J.*) repeatedly inquired whether Poblete understood the proceedings and instructed both Poblete and the interpreter to alert the court if problems arose in the translation process. Poblete testified on December 4 and 5, following an extended colloquy regarding this decision with his attorney, the interpreter, and the court. On December 5, during cross-examination regarding testimony his wife had given the previous day, Poblete testified through the interpreter that "[h]e didn't understand that much [the previous day] and don't remember either."

[¶ 17] After the close of evidence on December 5, the court questioned Poblete about the comment he made during cross-examination. Based on Poblete's answers,[3] the court arranged for the court reporter to prepare a transcript of the testimony presented during the afternoon of December 4, for Poblete to review with his attorney and the interpreter. Poblete moved for a mistrial, arguing that he had been denied a fair trial.

[¶ 18] When the trial resumed, Poblete's attorney assured the court that Poblete had reviewed the transcript "line by line" with the interpreter, and that Poblete "understood the substance of the transcript." Based on these assurances, and because the court found no factual support to substantiate Poblete's argument that he would have decided not to testify if he had understood everything his wife stated during her testimony, the court denied Poblete's motion for a mistrial. Poblete chose not to present additional evidence, and the case went to the jury.

[¶ 19] After deliberation, the jury found Poblete guilty of gross sexual assault, count one of the indictment, but remained deadlocked on the remaining eighteen counts. The court granted Poblete's unopposed motion for a mistrial on counts two through nineteen, and the State subsequently dismissed those counts. Poblete was sentenced to six years in prison, with all but three years suspended, and four years of probation. As a consequence of his conviction, the court required Poblete to register as a "lifetime registrant" pursuant to the Sex Offender Registration and Notification Act of 1999 (SORNA), 34-A M.R.S. §§ 11201–11256 (2008).[4] Poblete filed this appeal.

---

2. Following the court's order on the motion to suppress, Poblete pleaded guilty to counts one through fifteen of the indictment, but later withdrew his guilty pleas pursuant to M.R.Crim. P. 32(d).

3. As described by the interpreter, Poblete missed some of the "in betweens" of the December 4 testimony, when the interpreter had to explain the meaning of some English words that did not easily translate to Poblete's native language.

4. This version of SORNA has since been amended. *See* P.L. 2009, ch. 365, §§ A–1 to B–22 (effective Sept. 12, 2009) (codified at 34-A M.R.S. §§ 11201–11256 (2009)).

## II. DISCUSSION

### A. Motion to Suppress

[¶ 20] Poblete argues that the court (*Humphrey, C.J.*) erred in denying, in part, his motion to suppress statements he made to the police because: (A) he was not advised of his *Miranda* rights prior to custodial interrogation, and (B) his statements were involuntary. We address each argument in turn.

[¶ 21] "In order for statements made prior to a *Miranda* warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody, or was not subject to interrogation." *State v. Hassan*, 2007 ME 77, ¶ 13, 925 A.2d 625, 628 (quotation marks and emphasis omitted). Because there is no dispute that Poblete was interrogated, we are concerned here only with the issue of custody, which is a mixed question of fact and law. *See State v. Dion*, 2007 ME 87, ¶ 22, 928 A.2d 746, 750. "We give deference to the trial court's factual determinations, but the determination of whether an individual was in custody requires an independent *de novo* review." *Id.* (quotation marks omitted).

[¶ 22] In determining whether a person was "in custody," the ultimate inquiry is whether a "reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest." *Id.* ¶ 23, 928 A.2d at 750 (alteration in original) (quotation marks omitted). Our analysis of this issue is an objective one, guided by a number of factors, which we consider in their totality.[5] *See State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

[¶ 23] Viewing the facts established at the suppression hearing in light of the *Michaud* factors, we discern no error in the court's finding that Poblete was not in police custody at the time of the interrogation. Poblete voluntarily rode to the police station with his wife, the tone of the interview was calm and non-confrontational, and the detectives told Poblete that he could end the interview at any time. These facts, among others, distinguish this case from *Hassan*, 2007 ME 77, 925 A.2d 625, upon which Poblete principally relies.

[¶ 24] Poblete's voluntariness argument fares no better. "A voluntary statement is one that is the result of defendant's exercise of his [or her] own free will and rational intellect, as opposed to one that results from threats, promises or in-

5. These factors include:
(1) the locale where the defendant made the statements;
(2) the party who initiated the contact;
(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);
(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;
(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);
(7) whether the suspect was questioned in familiar surroundings;
(8) the number of law enforcement officers present;
(9) the degree of physical restraint placed upon the suspect; and
(10) the duration and character of the interrogation.
*State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226.

ducements made to the defendant." *State v. Lockhart*, 2003 ME 108, ¶ 29, 830 A.2d 433, 444 (alteration in original) (quotation marks omitted). Here, there were no threats of violence, *see State v. Coombs*, 1998 ME 1, ¶ 12, 704 A.2d 387, 391, Poblete's statements were not motivated by promises of leniency, *see State v. McCarthy*, 2003 ME 40, ¶¶ 12–13, 819 A.2d 335, 340, and the detectives did not employ trickery or deception, *see State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176. Nor did the detectives affirmatively mislead Poblete regarding his constitutional rights. *See State v. McConkie*, 2000 ME 158, ¶¶ 10–11, 755 A.2d 1075, 1078–79. The court committed no error in finding that the State had proved the voluntariness of Poblete's confession beyond a reasonable doubt. *See Dion*, 2007 ME 87, ¶ 32, 928 A.2d at 752 (stating that "factual findings are reviewed deferentially for clear error, but the application of legal principles to those findings is reviewed *de novo*"). Accordingly, the statements Poblete made to Detectives Thompson and Young prior to 5:04 p.m. were appropriately introduced at trial.

**B. Fair Trial**

■ [¶ 25] Poblete contends that the court (*Hjelm, J.*) should have ordered a mistrial because inadequacies in the trans-

lation services provided by the interpreter resulted in his failure to comprehend the trial proceedings, thus depriving him of a fair trial.

■ [¶ 26] "A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice." *State v. Bridges*, 2004 ME 102, ¶ 11, 854 A.2d 855, 858. Because of the trial court's superior vantage point, "[w]e review the denial of a motion for mistrial for an abuse of discretion." *State v. Rollins*, 2008 ME 189, ¶ 9, 961 A.2d 546, 549. "[W]e overrule a denial of a mistrial motion only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith." *State v. Cochran*, 2000 ME 78, ¶ 28, 749 A.2d 1274, 1281 (quotation marks omitted).

■ [¶ 27] In evaluating whether Poblete received adequate interpretive assistance, we recognize that criminal defendants with "limited English proficiency" are guaranteed the right to an interpreter pursuant to Maine law. *See* 5 M.R.S. § 51 (2009);[6] M.R.Crim. P. 28;[7] Guidelines for Determination of Eligibility for Court–Appointed Interpretation and Translation Services, Me. Admin. Order JB–06–03 (effective Oct. 11, 2006).[8] Like other expert

---

**6.** In pertinent part, 5 M.R.S. § 51 (2009) states:

When personal or property interest of a person who does not speak English is the subject of a proceeding before an agency or a court, the presiding officer of the proceeding shall either appoint a qualified interpreter or utilize a professional telephone-based interpretation service.

**7.** M.R.Crim. P. 28 states:

The court may provide, or when required by administrative order or statute shall provide, to individuals eligible to receive court-appointed interpretation or translation services, an interpreter or translator and determine the reasonable compensation for

the service when funded by the court. An interpreter or translator shall be appropriately sworn.

**8.** By administrative order, the Judicial Branch provides an interpreter for persons with "limited English proficiency." *See* Guidelines for Determination of Eligibility for Court–Appointed Interpretation and Translation Services, Me. Admin. Order JB–06–03 (effective Oct. 11, 2006). The phrase "limited English proficiency" applies to "individuals whose primary language is a language other than English and whose ability to speak English is not at the level of comprehension and expression needed to participate effectively in court transactions and proceedings." *Id.*

witnesses, interpreters are subject to evidentiary rules relating to qualification and must be appropriately sworn. *See* M.R. Evid. 604. Although our case law makes clear that minor deviations from the rules governing interpreters will not necessarily render a trial fundamentally unfair, *see, e.g., State v. Shulikov*, 1998 ME 111, ¶¶ 1, 4 n. 1, 712 A.2d 504, 505–06 (upholding the defendant's criminal conviction when the interpreter paraphrased parts of the trial testimony); *State v. Green*, 564 A.2d 62, 63–64 (Me.1989) (holding that the defendant received a fair trial although the interpreter had not been appropriately sworn), it is an "unquestioned principle that a defendant must be afforded the means to understand the proceedings against him," *State v. Doucette*, 398 A.2d 36, 40 (Me.1978). We have, therefore, strongly encouraged "trial courts to be vigilant in ensuring that interpreters perform their appropriate role in a judicial proceeding, namely providing a precise and accurate translation of the exact testimony of a witness." *Shulikov*, 1998 ME 111, ¶ 4 n. 1, 712 A.2d at 506.

[¶ 28] The Superior Court's handling of this case stands as a model of vigilance. In addition to ensuring that all statutory, administrative, evidentiary, and Rules-based requirements relating to the interpreter were followed, the court repeatedly sought confirmation that Poblete understood the trial proceedings and asked to be alerted if translation problems arose. The record reveals that the court went to great lengths to accommodate Poblete's need for interpretive assistance.

[¶ 29] Moreover, immediately upon learning that translation difficulties may have occurred, the court arranged for Poblete to review the trial transcript with his attorney and the interpreter. Although Poblete continued to press for a mistrial, he presented no evidence that the lack of a word-for-word contemporaneous translation of the December 4 testimony affected his decision to testify. In short, because Poblete failed to explain how any alleged inadequacy in the interpretation made the trial fundamentally unfair, the court did not abuse its discretion in denying his motion for a mistrial.

## C. Sufficiency of the Evidence

[¶ 30] Poblete's challenge to the sufficiency of the evidence requires only brief discussion. "[A] victim's testimony, by itself, is sufficient to support a guilty verdict for a sex crime or a violent crime if the testimony addresses each element of the crime and is not inherently incredible." *State v. Drewry*, 2008 ME 76, ¶ 32, 946 A.2d 981, 991 (quotation marks omitted). Here, the victim testified that prior to leaving for Job Corps on June 5, 2006, her father, Poblete, subjected her to sexual intercourse. The victim was seventeen at the time. The jury was entitled to rely on this testimony, which fully supports Poblete's conviction of gross sexual assault pursuant to 17–A M.R.S. § 253(2)(H).[9]

## D. SORNA

[¶ 31] At sentencing, the court determined that Poblete's gross sexual assault conviction warranted his classifica-

---

9. Title 17–A M.R.S. § 253(2)(H) (2009) provides:

2. A person is guilty of gross sexual assault if that person engages in a sexual act with another person and:

. . . .

H. The other person has not in fact attained the age of 18 years and the actor is a parent, stepparent, foster parent, guardian or other similar person responsible for the long-term care and welfare of that other person.

tion as a "lifetime registrant" pursuant to SORNA. Lifetime registrants are those convicted and sentenced for committing either a "[s]exually violent offense," or a "[s]ex offense when the person has a prior conviction for or an attempt to commit an offense that includes the essential elements of a sex offense or sexually violent offense." 34–A M.R.S. § 11203(8) (2008). Conversely, ten-year registrants are those convicted and sentenced for committing a "[s]ex offense." 34–A M.R.S. § 11203(5). Gross sexual assault, 17–A M.R.S. § 253(2)(H), the crime for which Poblete was convicted, is a "sex offense," 34–A M.R.S. § 11203(6)(B), and Poblete has no prior criminal history. Although Poblete did not dispute the court's determination and has not pursued a challenge on appeal, based on our obvious error review, *see*

*State v. Cannell,* 2007 ME 30, ¶ 6, 916 A.2d 231, 233–34, Poblete's conviction warranted classification as a "ten-year registrant." Accordingly, we remand to the Superior Court with instructions to correct the judgment to reflect that Poblete is a "ten-year registrant."

The entry is:

Remanded to the Superior Court to correct the judgment to properly reflect that Poblete is a "ten-year registrant." As corrected, judgment affirmed.