STATE OF MAINE                          UNIFIED CRIMINAL COURT
KENNEBEC, SS.                           Augusta
                                        Docket No. Kenn-CDCR-2015-592


STATE OF MAINE               )
                             )
                             )
                             )
        v.                   )      **Order on Defendant's Motion to Suppress**
                             )
                             )
Travis R. Gerrier,           )
             Defendant.      )

This matter comes before the court on the Defendant's motion to suppress, originally filed on January 3, 2017, with an amended motion filed on March 21, 2017. A hearing on this motion was held on April 20, 2017. The State was represented by Assistant District Attorney Michael Madigan, and the Defendant was represented by Sherry Tash Esq. Both parties were afforded ample opportunity to present evidence and argument in support of their respective positions.

The defendant is charged with one count of Gross Sexual Assault (Class A), Unlawful Sexual Contact (Class B) and Furnishing Liquor to a Minor, (Class D). The charges arose from alleged conduct by the Defendant on the evening of June 3, 2015 in Belgrade, Maine, involving a minor girl, (hereinafter C.F.) who was 11 years of age at the time. The Defendant was 21 years of age. In the present case, the defendant asks this court to suppress statements he made to police asserting that his statements were not voluntary, and taken in violation of Miranda v. Arizona. The defendant is also seeking to suppress any evidence resulting from the taking of his pants and underwear, and a DNA sample from him, on the grounds that that he did not voluntarily consent to this.


FINDINGS OF FACT

On June 4, 2015, commencing at approximately 12:29 AM, Detective Brockway of the Maine State Police, questioned the Defendant concerning his interactions with C.F. in Belgrade, earlier that evening. The Detective and the Defendant sat in his unmarked police car, in a public area, and the questioning continued for one hour and thirty-seven minutes. The officer and the Defendant were seated in the front compartment of his vehicle. There were two other officers present, who remained outside of the police car and did not participate in any of this questioning. Detective Brockway was initially alerted by one of the officers that the defendant appeared to be "cognitively slow". Detective Brockway testified that he utilized his training and questioned the Defendant in a manner suggested for children, or those on the autism spectrum. Before any questioning commenced, Detective Brockway told the Defendant that he was free to go, that he did not have to answer questions, and that no matter what happened, the Defendant was not going to be arrested that night. In fact, Detective Brockway told the

Defendant that he was free to go at least four times during the questioning, and that he was not going to be arrested that night, on at least three occasions. The Defendant was also informed that the doors of the vehicle were unlocked. The Defendant's mother and sister were also present on the scene during the questioning.

The Defendant was further advised that if he answered questions that he should tell the truth, and that if he did not know the answer or did not understand the question asked, he should answer accordingly. The Defendant was told by the Detective that he was not there to judge the Defendant. The Defendant was conversant, and was able to describe his normal routine, including his prior school history. During the course of the discussion, the detective remained calm and non-confrontational, though the detective was persistent in his questioning, advising the Defendant that "he was leaving stuff out", and that "he knew a fair amount about what had happened", and encouraged the Defendant to be truthful by stating "lets get it all out tonight". Notably, at no time did the officer tell the Defendant what the facts were, or directly or indirectly what he believed the Defendant had done. He persisted with questioning, and gradually the Defendant provided more detail as to what had occurred that evening. At no time did Detective Brockway raise his voice, or act in an accusatory manner. He remained calm and non-confrontational throughout.

The Defendant told Detective Brockway that he had come to know C.F through his cousin, who goes to school with C.F. Defendant and C.F. had corresponded on Facebook and exchanged approximately 50 messages in which the Defendant flirted with her and talked about his desire to meet in person. The Defendant and C.F. met for the first time on May 31, 2015, and did not meet again until June 3, 2015, the date in which the alleged incident is asserted to have taken place. On that day the Defendant and C.F. exchanged messages on Facebook about meeting later that day at "Maine-ah's" a roadside snack shack on the Smithfield Road in Belgrade. This is a rural location which serves fast food with a picnic table for patrons to use. There is a porta-potty on the premises. They arrived there in the early evening. Both walked a significant distance to the meeting place. At the time of their meeting, the snack shack was closed and they were alone. The Defendant and C.F. engaged in conversation which led to hugging and kissing. The Defendant brought a bottle of Gatorade from home which also contained alcohol. C.F. and the Defendant both drank from this bottle. The hugging and kissing occurred in various places on the premises, including inside a building and inside the porta-potty. The Defendant ultimately stated that inside the porta-potty, the physical contact increased, resulting in sexual touching, oral sex and sexual intercourse. Afterward, the Defendant and C.F. remained inside the porta-potty until they heard voices outside looking for them.

Toward the end of the Detective's questioning, the Defendant was asked to allow a DNA swab on the inside of his cheek. The Defendant agreed and stated that he did not have any questions, and in fact offered to provide another DNA sample if needed. The Detective stepped outside of his vehicle and briefly conversed with another officer. When he returned, he asked the Defendant for permission to take his pants and underwear, in case they contained evidence. The Defendant replied that they could have his underwear, but that he did not want to give up his pants. The Detective explained that he would assist him in getting another pair of pants to wear, which seemed to mollify the defendant somewhat. He agreed to allow the taking of both

articles of clothing. This permission was given orally, and later in writing as the Defendant signed a consent statement. The questioning ended at 2:07 AM, or approximately one hour and thirty-eight minutes after it started.

## DISCUSSION

We first examine whether Detective Brockway's questioning of the defendant constituted a custodial interrogation requiring a Miranda warning.

"A person is not subject to formal arrest may be in custody if a reasonable person standing in the shoes of the defendant would have felt he or she was not at liberty to terminate the interrogation and leave or if there was a restraint on freedom of movement of the degree associated with a formal arrest. This test is an objective one, and we have stated that in analyzing whether a defendant is in custody, a court may consider the following factors:

1) The locale where the defendant made the statements;
2) The party who initiated the contact;
3) The existence or non-existence of probable cause to arrest (to the extent communicated to the defendant)
4) Subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect a reasonable person in the defendant's position would perceive his freedom to leave;
5) Subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his freedom to leave;
6) The focus of the investigation (a reasonable person in the defendant's position would perceive it);
7) Whether the suspect was questioned in familiar surroundings;
8) The number of law enforcement officers present;
9) The degree of physical restraint placed upon the subject
10) The duration and character of the interrogation.

These factors are viewed in their totality, not in isolation". State v. Dion, 928 A2d 746 (Me. 2007). In Dion, the Law Court held that the Defendant was not in custody for Miranda purposes because the interrogation was conversational and cooperative in nature and the officers were calm and polite with no degree of physical force or restraint.

In the present case, this court determines that the defendant was not in custody. The defendant made his statements in an unlocked, unmarked police car on the premises of the snack shack. There were two other police officers present outside of the police car, not involved in the questioning of the defendant. The Defendant's mother and sister were also present on the premises. The defendant was told several times that he was not going to be arrested that night. He was not told that there was probable cause to arrest him. It was suggested that the detective knew about what had happened earlier that evening. The officer also told the defendant on several occasions that he was free to leave, and that the doors of the vehicle were not locked. The presence of his mother and sister likely reinforced this message. The defendant appeared to understand what

he had been told by the Detective concerning his ability to leave and that he would not be arrested that night. The defendant was questioned after midnight in a location he was familiar with, with his mother and sister present. The court concludes that there was no physical restraint placed upon the defendant. The questioning lasted for one hour and thirty-eight minutes, and it was relatively relaxed, cordial and non-confrontational in tone.

Therefore, under the totality of the circumstances and against an objective standard, the Defendant was not in custody and no Miranda warnings were necessary. The court finds that the Defendant "participated freely in the interview and volunteered a substantial amount of what he apparently believed was relevant information". State v. Gould, 43 A2d 952 (Me. 2012).

## VOLUNTARINESS OF STATEMENTS

If a criminal defendant challenges the voluntariness of a confession, a court must determine if the confession resulted from the "free choice of a rational mind, was not a product of coercive police conduct, and if under all of the circumstances its admission would be fundamentally fair. This assessment of voluntariness is based on the totality of the circumstances, and includes both external and internal factors such as: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability and conduct." State v. Dodge, 17 A3d 128 (Me. 2011). In Maine, when a defendant in a criminal case moves to suppress statements on the ground that they were made involuntarily, the state has the burden to prove voluntariness beyond a reasonable doubt. State v. Hunt, 151 A3d 128 (Me. 2016).

In the present case, as stated previously, the questioning, which took place, was calm, non-confrontational and non-threatening. No false promises were made, and the defendant was told that he was free to leave, that he would not be arrested that evening irrespective of his cooperation, and that the car doors were unlocked. His mother and sister were present at the scene. The questioning lasted for one hour and thirty-eight minutes which the court concludes is not unreasonable. The questioning took place in an unmarked police car on the premises of the snack shack. There were two other officers present on the premises but they did not take part in the questioning which led to the defendant's statements which are the subject of this motion. The Defendant was not in custody, and the Defendant was not given his Miranda warning. Detective Brockway was persistent in his questioning, encouraging the defendant to provide more detail, advising him that he (Detective Brockway) knew a lot about the case, and that the Defendant should "get it all out tonight". This persistence was gentle, non-confrontational, non-accusatory and non-threatening. There was no police trickery or threats. The Defendant was promised that he would not be arrested that evening. The Defendant was encouraged to be truthful, but not in a manner which amounts to coercion. Our Law Court has previously held that "mere admonitions or exhortations to tell the truth will not, by themselves, render a confession involuntary." State v. Knights 482 A2d 436, 442 n.4 (Me 1984).

With respect to the Defendant's mental health, this court heard the testimony from Doctor Robert Riley, that the Defendant had an IQ of 65, and the cognitive ability of an 11-12 year old child. Doctor Riley also testified that in 2012, the Defendant had been found to be functioning at a third grade level. The Defendant's ability to process information ranged between low and extremely low. In questioning someone like the Defendant, Dr. Riley opined that it would be important to use small words, and to be repetitive in the form of questioning to ensure the Defendant was able to grasp what was being asked of him. That the Defendant should also be asked to repeat back the questions to ascertain that he understood the content and import of the question. The fact that the Defendant states that he understands the question does not necessarily mean that he does, according to Doctor Riley. Further, Doctor Riley opined that at the late hour of the questioning, the Defendant was likely tired and nervous, and was more vulnerable to stress. Doctor Riley expressed doubts concerning the extent to which the Defendant understood the full nature as to what was occurring during his encounter with the Detective.

Dr. Riley's testimony and report must be considered in conjunction with the tape recording of the questioning made by Detective Brockway and his testimony. Prior cases have also made clear that when the Defendant seeking suppression suffers from mental illness or a low IQ, that the circumstances surrounding the making of these statements should be subject to greater scrutiny. In State Caouette, 446 A.2d 1120 (Me. 1982) our Law Court declared:

"The test of voluntariness requires asking: Is a confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. The line of distinction is that at which governing self-direction is lost and compulsion, of **whatever nature,** or however infused propels or helps propel a confession". (Caouette, HN4). In Caouette, the court found that the defendant was being held at the Androscoggin County Jail, and had been sent to the jail's medical room in response to his illness which has caused vomiting, and crying. He asked to stay in the medical room and talk. The Deputy Sheriff repeatedly told Caouette that he did not want to discuss his case because he was not the investigator, and that any statements he made would be used against him. This warning was repeated several times. "Finally, unable to stop the defendant from talking, the deputy returned him to the cell area" Id. at 1121. The court in Caouette, was not finding any fault with the officer. Rather, the court stated: "But, in our opinion, voluntariness is not necessarily established by proving that the confession was spontaneous or by proving the absence of an improper purpose on the part of the questioning officers…(Id. at 1123). In upholding the judgment of the Superior Court, the court in Caouette pointed to the dispositive factors which allowed the Superior Court's findings that the state had not proved voluntariness beyond a reasonable doubt: "the defendant was incarcerated, that he was vomiting, crying, frightened, emotionally upset, and that he had no conscious intent to discuss the case. (Id. at 1124). In the present case, none of these factors are present.

In State v. Poblete, 993 A.2d 1104(Me. 2010) the court affirmed the voluntariness of the confession after finding the Defendant had been told that he did not have to speak and that he could end the interview at any time; the tone of the interview was calm and non-

confrontational; the electronic recording of the interview showed that the Defendant appeared to speak willingly; no threats were made by the officers, and no trickery or deception was employed. The officers did not affirmatively mislead the defendant regarding his constitutional rights, and there were no promises of leniency. Id. at 23-24. These factors, cited with approval by the Poblete Court, are observed in this case.

Finally, the court is to consider a defendant's cognitive ability as part of the voluntariness determination. State v. Hunt, 151 A.3d 911 (Me. 2016) In Hunt, the defendant had an IQ between 75 and 81 and his self-incriminating statements were found to be involuntary. However there were many other factors in Hunt which distinguish it from the case before this court. In Hunt, there were two officers involved in the questioning, and they made statements to the defendant, assuring him that if he confessed to sexual contact with the victim, thereby taking the officers up on the "one time opportunity" they were offering him, Hunt would not be subject to the sex offender registration requirements. The officers also appeared to both induce and threaten Hunt toward his confession. They told him:

"...Guys like you...they don't end up in situations like that dramatic. (referring to the sex offender registration list) They get help and they get opportunities like you're being given here today...You need to think about it because you don't get this opportunity twice. After today, its over. You're not gonna have another opportunity to come in here and explain yourself to (the first detective) and he's not going to have another opportunity to help you. Because if he thinks you're lying, after today, all hands are off...If he knows you're telling the truth, we can work with this. You could still go home today. Okay? Nobody's said you're going to get arrested. Right? Nobody's told you that today, right? This list thing you're worried about? That's for people at the other end of the spectrum. That's for the people that are problematic." Following this exchange, Hunt confessed only to be told that the officers were not in control over who went on the sex-offender registration list. The implicit promise made just prior to his confession was retracted immediately following his confession.

The Law Court ultimately held that "although no single factor renders Hunt's confession involuntary, the totality of the circumstances, in particular, the officer's misleading statements in light of Hunt's cognitive disability and his apparent reliance on those representations---rendered Hunt's confession involuntary as a matter of law.

In the present case, the conduct of Detective Brockway has nothing in common with the inducements, threats and broken promises present in the Hunt case. Detective Brockway by comparison conducted himself with calm, professionalism, honesty and in a non-threatening, non-confrontational manner. The Defendant was not in jail, or in custody, and he was not physically sick or emotionally distraught. He was naturally reticent to provide full details to Detective Brockway as to what had occurred, but over the course of 97 minutes these details emerged in a gradual manner. Throughout his conversation with Detective Brockway he professed to have made a mistake and spoke of the shame that he had. When Detective Brockway left the vehicle, the recording continued, and the Defendant was heard to make the following statements in which he seemed to fully appreciate the gravity of what he had done:

"Fuck, what was I thinking? What the fuck was I thinking? (C.F.), if you can hear this tape, I fucked up tonight."

This court takes seriously the concerns expressed by Doctor Riley in his testimony. The court has listened to the tape recording of the questioning of the Defendant by Detective Brockway, along with his testimony. While this court and previous courts have made clear that the voluntariness of statements made by those with cognitive impairment are subject to heightened scrutiny, the conduct of Detective Brockway in his questioning of the Defendant was highly professional, taking into account the Defendant's impairment through the exercise of restraint, sensitivity and gentle persistence. The Defendant was in no way led to the statements that he made, in that it was never suggested to him explicitly what it was that he had done. Following a review of this taped conversation, this court is convinced that the Defendant's statements were knowingly, intelligently and voluntarily made.

Based upon the totality of the circumstances, this court concludes that the State has proven beyond a reasonable doubt that the Defendant's statements were voluntary.

### THE TAKING OF CLOTHING AND THE DNA SAMPLE

The State has the burden of proving that the defendant voluntarily allowed Detective Brockway to take his pants, underwear and a DNA sample from him, by a preponderance of the evidence. Based upon the foregoing, this court has no trouble concluding that the Defendant voluntarily consented to the taking of a DNA sample from him. Similarly, this court has little difficulty in determining that he consented to the taking of his underwear, "in case it contains evidence". The Defendant was more reticent about allowing the taking of his pants, primarily because he was concerned about what he would wear. When it became clear that the Defendant would be assisted in obtaining appropriate clothing, the defendant's concerns appeared to have been addressed. This court utilizes the findings that it has previously made to conclude that the Defendant voluntarily consented to the taking of a DNA sample, his pants, and underwear, and that this has been established by a preponderance of the evidence.

### CONCLUSION

For the reasons stated herein, the defendant's motion(s) to suppress are denied.

The clerk is directed to incorporate this Order into the criminal docket by reference.

Dated: May 11, 2017

JUDGE, MAINE UNIFIED COURT

STATE OF MAINE
KENNEBEC,ss.

UNIFIED CRIMINAL DOCKET
AUGUSTA
DOCKET NO. CD-CR-15-592
CD-CR-16-302

STATE OF MAINE

v.

**ORDER OF COURT REGARDING
DEFENDANT'S COMPETENCY**

TRAVIS GERRIER,
    Defendant

This matter was brought before the undersigned on December 5, 2016 with respect to counsel for Defendant's contention that the Defendant is presently not competent to stand trial for the offenses of Gross Sexual Assault, Class A, Unlawful Sexual Contact, Class B, and Furnishing Liquor to a Minor, Class D, the offenses being contained in an indictment bearing the Docket No. above, as well as the offenses of Tampering with a Victim, Class B, and Violation of Condition of Release, Class C in Docket No. Kenn. CD-CR-16-302. After hearing, the Court enters the following **Order** concerning Defendant's competency for the reasons set forth below:

1. Defendant is charged with Gross Sexual Assault, Unlawful Sexual Contact, and Furnishing Liquor to A Minor on or about 6/3/15 in Belgrade, Maine. Defendant is also charged with Tampering with a Witness, here the alleged victim in the offenses mentioned previously, and violating his conditions of release between 1/1/16 and 1/17/16 in Belgrade, Maine. Defendant has pleaded not guilty to all charges.

2. Defendant was set to enter a plea of guilty to some of the matters set out above on 8/11/16; however, before the plea was entered Defendant began "acting up" such that the plea proceeding was cancelled and the State withdrew its offer.

3. Thereafter Defendant was indicted on all charges on or about 9/23/16.

4. Defendant was evaluated by Dr. Andrew Wisch for the purposes of a psychological evaluation on 9/24/15, by Dr. Sarah Miller for the purposes of a psychosexual evaluation on 5/13/16, by Dr. Robert Riley for the purposes of a neuropsychological evaluation on 3/11 and 3/17/16, and most recently by Dr. Riley for the purposes of a competency evaluation on 10/28/16.

5. According to a letter from defense counsel dated 6/15/16 enclosing the first three evaluations for the undersigned's review, both Dr. Wisch and Dr. Riley had evaluated the Defendant "for competency...and found (the Defendant) competent...," *see* letter dated 6/15/16 for more details.[1]

6. Dr. Wisch opined that Defendant's verbal skills were strong enough such that Defendant "should be able to learn and apply new information when it is presented at a pace that he can handle, repeated, and reinforced by a skilled therapist." Dr. Wisch also opined that Defendant as a result of his cognitive problems has a tendency to misunderstand new information and/or to say he understands it when he really does not. "As such, it will be important for his therapist to have him repeat back in his own words his understanding of new concepts as he learns them, correct any misinformation, and repeatedly reinforce the correct information." *See* Dr. Wisch's report dated 18/8/15 for more details.

7. Dr. Miller noted in her report that Defendant's attention and concentration were "adequate for purpose of the evaluation. His presentation suggested someone with limited intellectual functioning...(H)is insight into his limitations appeared good." Defendant indicated to Dr. Miller that he felt guilty after the instant offense as he "began to realize how old she was." He acknowledged that it was "the age difference is why I got in trouble" and that it "took me awhile to realize what I did was wrong..."

8. Dr. Riley noted in his report of 3/25/16 that the Defendant has had "numerous evaluations over the years, all of which demonstrated significant limitations in cognitive abilities, and evaluations of cognitive skills have demonstrated significantly lowered mental skills." The Defendant has "significant feelings of remorse regarding the incidents."

9. Dr. Riley in his report dated 11/10/16 noted Defendant's conduct in court in August of this year that resulted in the Court not proceeding with Defendant's expected plea to reduced criminal charges. Dr. Riley noted that Defendant the next day explained in part his behavior in court the day before as a result of Defendant being upset after Defendant was informed that Defendant might have to register on the sex offender registry for life. As a result of Defendant's actions in court the State withdrew its plea offer and decided to move forward on the much more serious sex offense charge that would result upon conviction in a 20 year "basic sentence." His attorney at that time "indicated that she was very concerned that, given the complexities of a more severe charge, potentially longer sentences, and potential trial procedures, that Mr. Gerrier would not be able to truly understand and participate in such complex proceedings..."

---

[1] There is no mention of concerns regarding Defendant's competency in Dr. Wisch's report, or in Dr. Miller's report, or in the initial report of Dr. Riley. The reports do confirm that Defendant has a long history of mental health issues and treatment along with limited cognitive and intellectual abilities. Defendant's dob is 5/3/94. Defendant has no previous criminal history.

10. "Defendant has continued to opine that if the alleged victim would tell people that the actions were consensual, then everything would be ok... even though it has been explained to him several times that an underage person could not consent to such activity." *See* Report of 11/10/16 at page 3, 4.

11. Defendant has also opined that it was important to him for the alleged victim "to tell the truth" (i.e. that the sexual encounter was consensual) so that "he would feel better, and so he would know whether or not she still cares about him."

12. Dr. Riley opined in his latest report that Defendant "had a limited understanding of a jury trial and the advantages or disadvantages of such a trial." The report evidences that Defendant has an understanding of the concept of a "plea bargain" as well as Defendant's understanding that there "had been a deal before I flipped out...and I had messed that up." Defendant also appeared aware of the general nature of the charge against him and that it was a serious charge.

13. Dr. Riley concludes in his latest report that Defendant "does appear to have some elementary skills associated with trial competence, including some factual understanding of his case." Dr. Riley also finds that because of the "complexity of the present situation, including the complexity of options of going to trial, accepting plea bargains, understanding sentencing options, and other more complex issues which have arisen, it does appear that his combination of intellectual disability, autism spectrum disorder, and significant mood issues do significantly impair his ability to demonstrate the full range of trial competence skills needed for this complex situation." *See* Report of 11/10/16 at page 9.

14. It is the undersigned's conclusion that defense counsel and Dr. Riley believe that Defendant is competent to enter a plea to a less serious offense, but is not competent when Defendant is facing the possibility of a conviction for a more serious offense that carries with it the potential for a decade-plus term of incarceration.

15. A competent defendant is one who is capable of understanding the nature and object of the charges against him, comprehending his own condition in reference thereto, and cooperating with counsel to conduct a defense in a rational and reasonable manner. *Haraden v. State*, 2011 ME 113, ¶ 7. Counsel cannot effectively assist his client when the client is unable to meaningfully communicate with counsel. *Id.* at ¶ 11.

16. The factors in determining whether a defendant is able to assist counsel are set out in footnote 3 in the *Haraden* decision. This Court is free to find Defendant competent in the face of uncontradicted expert testimony opining otherwise; furthermore, it is well established that a defendant may be both mentally ill and competent to stand trial. *State v. Ledger*, 444 A.2d 404, 418-19 (Me. 1982); *Thursby v. State*, 223 A.2d 61, 68 (Me. 1966).

3

17.   The undersigned after reviewing the factors set forth in *Haraden* with regard to the evidence presented at hearing finds that Defendant is competent to stand trial in this matter.   Although imperfect to varying degrees depending upon      what      particular      factor/function      one      considers, Court nevertheless finds that Defendant has demonstrated an ability to perform each function set forth in *Haraden*.

18.   A defense attorney has the initial responsibility to alert a court to a defendant's possible incompetence. *State v. Dyer*, 371 A.2d 1079, 1086 (Me. 1977). The undersigned does not minimize the challenge of representing the ever-increasing number of defendants who have underlying mental health issues; nevertheless the undersigned has no concerns that the Defendant in this case is competent to stand trial in this matter, having demonstrated an ability, although admittedly imperfect, to understand the nature and object of the charges against him, comprehending his own condition in reference thereto, and cooperating with counsel to conduct a defense in a rational and reasonable manner.

**SO ORDERED.**

Date: 12/14/16

BY _____
        Robert E. Mullen, Deputy Chief Justice
        Maine Superior Court

4