need Atty info                    4/1/21

STATE OF MAINE

AROOSTOOK, ss

STATE OF MAINE

Christana Rein

vs.

RAY A. GALPIN

Defendant

Hunter Tzovarras

UNIFIED CRIMINAL COURT

LOCATION: CARIBOU

DOCKET NO. CR-19-172

MURISC#204-21

)
)
)
)
)
)
)
)
)
)
)

ORDER ON MOTION
TO SUPPRESS

By an Indictment dated April 4, 2019, Defendant Ray Galpin (hereafter "Galpin") is charged with Sexual Abuse of a Minor, Class C (17-A M.R.S.A. §254(1)(A-2)) and Unlawful Sexual Contact, Class D (17-A M.R.S.A. § 255-A(1)(F-2)). Pending before the court is Galpin's Motion to Suppress Statements, filed November 30, 2020. Galpin contends that he was subjected to a custodial interrogation by a law enforcement officer without the benefit of *Miranda* warnings, and that any statements made were not made voluntarily. Hearing on the motion was held March 17, 2021. At hearing testimony was received from Detective Christopher Foxworthy of Maine State Police. Also admitted into evidence was Exhibit 1, which is a recording of the interview of Galpin conducted on September 12, 2018.

Findings of Fact

The court makes the following findings of facts upon consideration of the testimony presented at hearing and from watching the video of the interview of Galpin conducted on

1

September 12, 2018 (any references to the video will be to the approximate video timer (Vid. _', _")):

In September of 2018 Maine State Police were investigating allegations that Galpin had had unlawful sexual encounters with two minor females. Prior to interviewing Galpin, the investigation included interviews of the two minor females, Courtney and Tristan, as well as attending an interview of one of the minors at the Child Advocay Center. On September 11, 2018 Detective Foxworthy went to Galpin's residence in Presque Isle to initiate an interview. No one was present at the residence so Detective Foxworthy left his business card at the door, with his cell phone number written on the back. Galpin called detective Foxworthy later that day. Detective Foxworthy asked Galpin if he would meet him for an interview on a matter he was investigating. Detective Foxworthy did not tell him what the investigation involved. Galpin agreed to meet Detective Foxworthy the next day, September 12, 2018 at 9 am at the Presque Isle Police Department.

Galpin, accompanied by is girlfriend, arrived by private transportation at the Presque Isle Police Department at 9 am on September 12, 2018. After entering the lobby, he was met by Detective Lawrence Anderson of Maine State Police. Detective Anderson led Galpin to the interview room which was adjacent to the lobby. The distance from the main entrance of the lobby to the interview room is approximeately 30 feet. Detective Foxworthy was already in the interview room when Galpin entered.

The interview room was furnished with a table and chairs, and a recording camera, and is accessed by two doors. One door is to the lobby, and the second door is to a hallway which leads to the inner offices of the police department. There are no windows.

When Galpin entered the interview room, he was greeted by Detective Foxworthy, who was standing, and the two shook hands. Detective Anderson entered the interview room immediately after Galpin. As Detective Anderson shut the door, he told, and showed, Galpin the door could be opened and was unlocked. (Vid. 0', 21"). Detective Anderson and Galpin then also shook hands. Both detectives were dressed in plain clothes, and each was wearing a sidearm that was fully concealed under their clothing.

After exchanging greetings, Galpin sat at the head of the table, with the lobby door immediately to his right, and the hallway door behind him. The detectives sat at opposite sides of the table. Neither detective blocked Galpin's access to the doors. All of them remained seated at the table for the duration of the interview. Although the officers questioned Galpin in an interrogative manner, the detectives spoke in a conversational, non-threatening tone throughout the duration of the interview. There was never any yelling, screaming, or raised voices. And no aggressive gestures or threatening body movements were ever made. Through the interview, Galpin drank from a Tim Horton's coffee cup that he had brought with him. And for the duration of the interview Galpin maintained his composure, appeared calm, and remained attentive and responsive to the questions. Galpin, who was 37 years old at the time, appears to have been in good health, rested, and never appears to be in distress, emotional or crying. When the interview was concluded, the detectives and Galpin all stood up, shook hands, and Galpin then exited the interview room with his coffee. The entire interview lasted about 1 hour, 18 minutes. Galpin was arrested 8 months after the interview.

Detective Foxworthy was the lead investigator, but was joined by Detective Anderson as it is policy to have two detectives present for interviews of this nature. Detective Foxworthy began the interview by telling Galpin he was there voluntarily, he was not under arrest, he could

3

leave at anytime, the door was not locked, and that he would not hold him up if he left. And Detective Foxworthy told Galpin "..nothing we talk about today-short of you confessing to a murder, which I'm not investigating-will result in you being arrested today. OK?" (Vid. 0', 45"). Galpin indicated he understood. (Vid. 0',45"). Detective Foxworthy testified Miranda warnings were not read because he did not believe the interview was custodial. By the time of the interview, Galpin was the primary focus of the investigation. Although Detective Foxworthy acknowledged they may have had probable cause based on the victim's statements, he testified they were still investigating, intending to complete their report to present to the District Attorney for review. When asked on cross-examination why he told Galpin he would not be arrested that day, Detective Foxworthy responded that he assumed Galpin would have found it nerve racking to be invited in for an interview, and he he wanted to put him more at ease and willing to talk.

Detective Foxworthy next inquired how Galpin slept the night before, and if he had consumed any drugs or alcohol. Galpin, who was 37 at the time, indicated he only had two hours of sleep, but explained that was normal and he felt fine that day, and that he had not drank the night before or taken any drugs.(Vid. 1', 10" -1', 30"). Detective Foxworthy then asked Galpin several background questions, including date of birth, address, contact information, work, and relationship status.

After asking background questions, Detective Foxworthy asked Galpin if he knew why he wanted to speak with him. (Vid. 4', 30"). Galpin responded that he wasn't really sure, but wondered if it was about a child custody matter. The detective told him that was not the purpose, then began to ask Galpin if he knew "Courtney". (Vid. 5', 40"). Once they confirmed Courtney's last name, Galpin explained she was a cousin. After briefly discussing the nature of the family relationship, Detective Foxworthy told Galpin that Courtney had alleged that she and Galpin had

4

had sex. Galpin denied the allegation. (Vid. 6', 00"to 7', 00"). Over the next several minutes, both Detective Foxworthy and Anderson continued to ask questions related to the allegations made by the two victims, Courtney and Tristan. The tactics utilized by the detectives included: presenting Galpin with different possible scenarios how a sexual act may have occurred; assuring Galpin they did not think he was a bad guy while also indicating they just wanted to get to the truth; asserting the allegations must be true as there were two different victims who independently made the same allegations, and that his version did not add up; their wanting to be able to write in their report that this was an isolated event, unlikely to happen again; and presenting the scenario that this was a situation where maybe counseling was needed. Some examples of the interrogation follow:

- on several occasions the detectives exhorted Galpin to tell the truth, using phrases that they "..just want the truth..", the facts, "..get the cards out on the table..", "..iron things out.." (Vid. 12'20");

-on several occasions the detectives told Galpin they thought he was a good guy, and not a bad guy, and they weren't judging him, but they needed to know what happened; (Vid. 10'30", 20', 30");

- Detective Anderson stated they like to "..get all the facts on the table..iron them out.....and if counseling is needed, that is something that could be done.." (Vid. 18').

- the detectives told Galpin they believed something happened, but that they did not think Galpin was a bad guy, but they needed to make sure, which is why they needed him to tell the truth. (Vid. 24')

- Detective Anderson presented Galpin with a scenario that Galpin had feelings for Courtney, the sex was consensual, they kissed, "..juices got flowing..", and he couldn't stop. (Vid. 19', and 22')

- The detectives stated they didn't want to leave thinking Galpin was a predator, and didn't think he was, and that they thought it was a one time event, but needed to know for sure. (Vid. 19', 23'); and that they weren't judging him nor think he was a bad guy. (Vid. 20'30").

- after Galpin told the detectives these allegations had been falsely raised before and went away, Detective Anderson told Galpin the investigation would not be going away this time. (Vid. 20'40")

- Several times the detectives told Galpin his story did not add up, that they believed the victims, and they questioned "why would they lie?", and pointed out there were two independent victims making the same type of allegation; Detective Foxworthy also said " one statement maybe just smoke...but two...might be a fire.." (Vid. 18'-21' );

-the detectives told Galpin they wanted to be able to write a report that this was a one time event, not likely to happen again; and if he told the truth, they would not have to come back again. (Vid. 23'-24').

In closing arguments made at hearing, Galpin asserts that by the 23 minute mark of the interview, the interview was custodial and no longer voluntary.


Discusson

1. Was the interview of Galpin custodial?

Galpin contends the interview by Detective Foxworthy and Detective Anderson at the Presque Isle Police Station was custodial, or became custodial during its course. The State does

not dispute that Galpin was subjected to an interrogation, and that *Miranda* warnings were not given.

The law is clear that a *Miranda* warning is necessary only if a defendant is: (1) in custody; and (2) subject to interrogation. Statements made by a person subjected to custodial interrogation who is not first given *Miranda* warnings are inadmissible against that person at trial. *State v. Nadeau*, 2010 ME 71, ¶53, 1 A.3d 445, 464 (internal citations and punctuation omitted) A person, who is not subject for formal arrest, may be in custody if a reasonable person standing in the shoes of the defendant would have felt that he was not at liberty to terminate the interrogation and leave or if there was a formal arrest or restraint on freedom of movement. *Id*. The State must prove that police conduct was constitutionally valid by a preponderance of the evidence. *State v. Kittredge*, 2014 ME 90, ¶ 17, 97 A.3d 106. Courts consider the totality of a number of factors in making the objective determination if a person is in custody. Those factors include:

1. the locale where the defendant made the statements;
2. the party who initiated the contact;
3. the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);
4. subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

7

5. subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

6. the focus of the investigation (as a reasonable person in the defendant's position would perceive it.)

7. whether the suspect was questioned in familiar surroundings;

8. the number of law enforcement officers present;

9. the degree of physical restraint place upon the suspect; and

10. the duration and character of the interrogation. *Nadeau* at ¶54.

The interview of September 12, 2018 took place at the Presque Isle Police Station, at the request of Detective Foxworthy. But, the request and arrangements for the interview were done by phone, the prior evening. Detective Foxworthy told Galpin he would like to interview him regarding a matter he was investigating. Galpin agreed to meet, and he had the overnight to reflect on whether to attend. On the morning of September 12, 2018, Galpin went to the police station by private transportation, and was accompanied by his girlfriend. Galpin's appearance at the police station was clearly of his own volition.

Once in the interview room, Galpin was told by Detective Foxworthy that he was there voluntarily, was not under arrest, could leave at any time time, and that nothing he told them "..today.." would result in his being arrested "..today..". And the detectives both told, and showed, Galpin that the door could be open and was unlocked. Galpin indicated he understood. And there were no non-verbal communications by either detective which would cause Galpin to reasonably believe that he could not leave. He was seated closest to the door, and neither detective blocked his access or ability to leave. The detectives always remained seated, and did

8

not act, move, or gesture in an aggressive or threatening manner. Galpin was never denied or prevented from leaving, and the detectives said nothing that would cause him or a reasonable person in his position to believe he could not leave. There were never any discussions about when the interview would be done, or that Galpin could not leave. Galpin never said anything which could be interpreted as him wanting to leave or terminate the interview, nor even wanting a break. And there was nothing the detectives said or did that would cause a person in Galpin's position to perceive he could not leave. In summary, there is nothing Galpin said or did, or responses made by the detectives to things Galpin said or did, that would cause a reasonable person in Galpin's position to perceive he could not leave.

There is no doubt Galpin was the focus of the investigation, and that he, as would any reasonable person in his shoes, would percieve he was the focus. The court also finds that by the time of the interview, the State had probable cause to charge and arrest Galpin him for the crimes had they desired.

The interview was conducted in an interview room at Presque Isle Police Station, a setting Galpin was not familiar with. But the layout and furnishings of the interview room were rather benign, and the room appeared and was configured as any office or conference room would. There were no physical restraints of any kind, and as previoulsy mentioned, the positions where the detectives sat did not block or prevent Galpin from leaving or gaining access to the door. And there were no movements, gestures, or other non-verbal communication by the detectives that would prevent Galpin from leaving, or cause him to believe he could not leave.

In his closing made at the hearing, Galpin argued that the interview became custodial when the detectives told him if he told them the truth, they wouldn't have to come back. The

court disagrees. Those comments were merely exhortations to tell the truth, which will be discussed, *infra*.

The interview was conducted by two detectives. But having two officers present seems consistent with police practice. More importantly, having two officers present and questioninig him rather than just one did not meaningfully add to the degree or level of police power or intimidation. And again, although there were two officers present, the manner they positioned themselves in the room, and the manner they conducted the interview, was never aggressive or threatening; nothing the detectives did or said would have caused a person in Galpin's position to perceive he could not terminate the interview and leave, even with two officers present.

Finally, the interview lasted approximately 1 hour, 18 minutes. An interview of that duration is not long, and there was nothing about its duration or how it was conducted that would suggest Galpin was being detained or kept there involuntarily.

That Galpin was the focus of the investigation, probable cause to arrest existed, and that the interview was held at the police station weigh towards a custodial setting. But the detectives words and conduct during the interview, and how Galpin responded thereto, weigh more heavily to a non-custodial setting. Galpin was asked to come in for an interview-having overnight to reflect, he voluntarily appeared. The detectives clearly and unequivocally told him was not under arrest, was free to leave, and would not be arrested, and he was told and shown that the door was open- Galpin responded that he understood. And nothing changed over the course of the interview. Neither detective did or said anything that indicated, or would cause Galpin or a reasonable person in his position, to perceive he could not leave, including their words, conduct, gestures or how positioned within the room. The court finds that based on these facts, a reasonable person in Galpin's position would have believed he could terminate the interrogation

and leave at anytime. Accordingly, the court finds that the State has proven by a preponderance of the evidence that Galpin was not in custody at any time during the interview.

2. Were Galpin's statements made voluntarily?

Only a voluntary confession is admissible into evidence, and the State must prove voluntariness beyond a reasonable doubt. *State v. Kittredge,* 2014 ME 90 ¶24;*State v. McCarthy,* 2003 ME 40, ¶12, 819 A.2d 335, 340. The voluntariness requirement gives effect to three overlapping but conceptually distinct values:

(1) it discourages objectionable police practices;

(2) it protects the mental freedom of the individual; and

(3) it preserves a quality of fundamental fairness in the criminal justice system.

*State v. Hunt,* 2016 ME 172, ¶ 20, citing *State v. Mikulewicz,* 462 A.2d 497, 500 (Me. 1983).

To determine whether a confession is voluntary, the court must consider the totality of the circumstances. *State v. Lockhart,* 2003 ME 108, ¶ 30, 830 A.2d 433, 444. A confession is voluntary if it results from the free choice of a rational mind, if it is not a product of coercive police conduct, and if under all the circumstances its admission would be fundamentally fair. *State v. Coombs,* 1998 ME 1, ¶10. See also *State v. Mikulewicz,* 462 A.2d 497, 501(Me. 1983). In making its decision of voluntariness, the court may consider the following factors: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery, threats, promises or inducements made to the

11

defendant; the defendant's age, physical, mental health, emotional stability, and conduct. *Id* citing *State v. Sawyer*, 2001 ME 88 ¶9, 772 A.2d at 1176. *State v. Hunt,* 2016 ME 172, ¶ 22.


Before discussing the various factors and the totality of the circumstances of the interview, the court will also review the current law regarding *improper promises or inducements*. False promises of leniency that induce a confession are improper and will weigh significantly into the consideration of the totality of circumstances. *Hunt,* ¶29. A promise is false when it involves a benefit that could not be delivered –or is not in fact delivered- by the governmental agent making the promise, or when the agent has no authority to give the defendant what was offered. *Id*. A promise involves leniency when it suggests that the process of prosecution or sentencing will somehow be better for the defendant if the defendant confesses. *Id*. The determination of historical facts underlying a question of voluntariness must be made by the trial court, but the "psychological fact" of the voluntariness of a confession is a determination of law. *Hunt,* ¶ 34. Cognitive ability of a defendant is part of the voluntariness determination. *Id.,* ¶ 37. A defendant's characteristics are balanced against the pressure exerted by law enforcement. *Id.,* ¶ 38. The balancing of the personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant. When the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes more significant in the "voluntariness" calcalus. <u>Id.</u> citing *State v. Hoppe,* 661 N.W.2d 407, 414 (Wis. 2003). Relevant personal characteristics include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. <u>Id.</u>

To put this into context our Law Court has previosly ruled that the following representations by law enforcement were not improper promises of leniency: suggestion the State would get the defendant help. *State v. Gould,* 2012 ME 60, ¶ 11-13; officer suggesting the defendant would get alcohol counseling if he confessed. *State v. Lavoie,* 2010 ME 76, ¶ 21; officer telling the defendant "the more cooperative you are, the better things are for you", *State v. Nadeau,* 2010 ME 71, ¶ 57; officer telling defendant "it will look better for you to confess", *State v. Dion,* 2007 ME 87, ¶ 34; officer telling defendant "it would be better to tell us the truth", "it will make you feel better", "people would think more of him if he got it off his chest", *State v. Theriault,* 425 A.2d 986, 990 (Me. 1981).

On the other hand, problematic false promises of leniency include: assuring defendant he would be charged with only one of the three burglaries if he would clear up all of the matters, *State v. Tardiff,* 374 A.2d 598 (Me. 1977); the officer promising that what he told him would remain confidential, *State v. McConkie,* 2000 ME 158.


The Law Court has noted that neither "generalized and vague" suggestions that telling the truth will be helpful to a defendant in the long run, *Kittredge, 2014 ME 90, ¶ 28,* nor "mere admonitions or exhortations to tell the truth," *State v. Tardiff, 374 A.2d 598, 601 (Me. 1977)* will factor significantly into the totality of the circumstances analysis. *Hunt,* at ¶ 23.

The court will now apply the factors listed above to the case at hand. Regarding Galpin himself, at the time of the interview he was 37 years old and appeared to be in good health, of average intelligence, sound mind, and reasonably articulate. Through the duration of the interview he remained composed and fully attentive; he understood the nature and purpose of the interview; and he comprehended the questoins being asked and was appropriately responsive. At

13

no time during the interview does he appear stressed, under duress, or as succumbing to pressure. Based on his appearance and presentation, his responses to the detectives questions appears to be the result of free choice of a rational mind.

The interview was conducted by two detectives. But as previously discussed, the manner in which the detectives conducted their interview, including their tone, how positioned in the interview room, and there non-verbal communication did not present as intimidating or coercive. The detectives never threatened Galpin. They never even touched him other than shaking hands at the beginning and end of the interview. Although the detectives used an interrogative tone, they never yelled or shouted at him. Although Detective Anderson did assure Galpin the investigation was not going away, that statement was not a threat, but rather making the point they intended to complete the investigation. And there is no evidence of police trickery.

The detectives did repeatedly tell Galpin they just wanted the truth, "..get the cards on the table..", and encouraged Galpin to tell them truthfully what had occurred. Although they were generally persistent in their requests for Galpin to be truthful, they were not overly persistent nor intimidating. Rather their requests of Galpin were merely exhortations to tell the truth, and were not done in a deceptive or threatening manner. See *Kittredge,* 2014 ME 90, ¶ 28, *State v. Tardiff,* 374 A.2d at 601. Similarly, the detectives telling Galpin they did not think he was a bad person, and they wanted to be able to write in their report that this was a one time event unlikely to happen again, were alternative means of encouraging Galpin to be truthful, and were not a promise of leniency. See *State v. Dion,* 2007 ME 87, ¶34; *State v. Nadeau,* 2010 ME 71, ¶57.

Galpin points to Detective Anderson's reference to counseling as a false promise. But the detective's reference to counseling was made while encouraging Galpin to be truthful, and pointed out that counseling was something that is oftened arranged in circumstances such as

14

those being investigated. The detective did not in any way promise or assure Galpin that if he confessed his only consequence would be counseling. See *State v. Lavoie*, 2010 ME 76, ¶ 21. No false promise was made. Furthermmore, Galpin did not respond in any manner to the comment of counseling. There is no evidence he made any admissions because of a hope for counseling.

And the length of the interview, 1 hour, 18 minutes was not excessive. Objectively, 80 minutes is not especially lengthy. In addition, the interview was conducted at 9 am, in the morning when Galpin was rested and starting his day. He never appeared tired or wore down, and his appearance did not change as the interview progressed. Per the video, Galpin went through the entire interview with generally the same demeanor and effect, always alert, responsive, and mentally and emotionally intact.

The interview was conducted at the police station. But as previoulsy described, the layout and setting of the interview room was generic, appearing as a typical office or conference room. There is nothing about the interview room, other than it being situated in the police station, that was intimidating or impacted Galpin's free choice.

*Miranda* warning were not given. But as previoulsy found, the interview was not custodial.

Considering the totality of the circumstances, the State has proven beyond a reasonable doubt that the statements made by Galpin were the result of free choice of a rational mind, and were not a product of coercive police conduct, and that the admission of his statements at trial would be fundamentally fair. The court finds that the statements made by Galpin were made voluntarily.

15

In conclusion, the court finds that the interview conducted of Galpin on September 12, 2018 was non-custodial, and that the statements and admissions made by him were made voluntarily.

The entry shall be: Defendant's Motion to Suppress Statements is denied.

April
~~March~~ 1 , 2021

Harold Stewart, II

Justice, Superior Court

16