STATE OF MAINE
CUMBERLAND ss.

UNIFIED CRIMINAL DOCKET
PORTLAND
DOCKET NO. CR-21-03257

STATE OF MAINE          )
                        )
v.                      )          ORDER ON MOTION TO SUPPRESS
                        )
CLAYTON RAWSTON,        )
                        )
            Defendant   )

This matter is before the court on Defendant's Motion to Suppress. The Defendant asserts the officer lacked reasonable articulable suspicion to conduct the stop; that the stop was unreasonably extended; and, that the Defendant was subject to custodial interrogation without benefit of *Miranda*.

A hearing was scheduled for May 11, 2023. In lieu of a testimonial hearing, the parties agreed to admit into evidence the investigating officer's body camera video recording, and his observations as set forth in the narrative police report. The Defendant filed his Memorandum of Law in Support of his Motion to Suppress on July 26, 2023, and the State's Memorandum of Law in Opposition to Defendant's Motion to Suppress was filed with the court on August 21, 2023.

The court has reviewed and carefully considered the video recording, the officer's narrative report, and the parties' Memorandums of Law. Based on the forgoing, the makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

On July 3, 2021, around 2:30 in the afternoon, the South Portland Police Department received a call from Curtis Gleason of Intown Towing. Mr. Gleason reported, among other things, that a tow truck driver was driving while intoxicated. Mr. Gleason stated that he had arranged for a flatbed tow truck from Ocean Street Towing to tow a car, but the car owner refused to allow the car to be towed because the tow truck driver, "Clayton," appeared to be drunk. Mr. Gleason called and spoke with Clayton on the phone and confirmed that he sounded intoxicated. Mr. Gleason said that Clayton was now driving the flatbed tow truck to the vehicle impound lot at 33 Rigby Road.

1

Officer Michael Armstrong was dispatched to 33 Rigby Road and found a flatbed tow truck from Ocean Street Towing parked in front of the impound lot. Officer Armstrong stopped his vehicle behind the parked flatbed. He approached the man standing in front of the tow truck, who was wearing a shirt with the name "Clayton" printed on the front. The man identified himself as Clayton Rawstron. He also identified the woman in the vehicle as his ex-wife, whom he'd been "driving around." *Video* at 00:45-01:25.

Officer Armstrong advised Mr. Rawstron that the police had received a report from a customer that "Clayton" was driving while under the influence of alcohol. Mr. Rawstron stated that he "cracked a tea on the way home," and drank it within the last half hour while driving to the impound lot. (Twisted Tea is an alcoholic drink). Mr. Rawstron stated he had just arrived at the lot and had not consumed any alcohol since then. *Video* at 01:20 -02:03, 03:00-03:40. Officer Armstrong observed that Mr. Rawstron's eyes were blood shot and glassy, his speech was slurred, he was unsteady on his feet, and he staggered as he walked.

Officer Armstrong administered Field Sobriety Tests (FSTs). In response to questions regarding any physical limitations, Mr. Rawstron said he had shoulder pain and an old back injury that caused him to limp, but otherwise he was able to walk and stand with no issues, and he was not taking any medications. *Video* at 03:50-04:30. On the HGN test, Officer Armstrong observed six out of six clues. *Video* at 06:10-08:45. On the walk-and-turn test, Officer Armstrong observed that Mr. Rawstron swayed, was unable to stand without stepping out of position, used his arms for balance, missed touching heal to toe several times, stepped off-line several times, took the wrong number of steps, and turned improperly. *Video* at 09:00-11:34. On the one-leg-stand test, Mr. Rawstron said he was unsure if he could do the test as the result of a hip injury but was willing to try. Less than ten seconds into the test, Mr. Rawstron stopped, saying he could not do it. *Video* at 12:00-14:55. Mr. Rawstron was able to recite the alphabet from E to T and counted backwards from 66 to 54, with no clues observed. *Video* at 15:00-16:00.

After completing the FSTs, Officer Armstrong asked Mr. Rawstron a few questions about when and where he consumed the Twisted Tea, what else he had to drink and his work schedule. While it was a difficult to fully understand the time line of events, Mr. Rawstron explained his work schedule, that he was supposed to work until 6 but because he's a subcontractor he works when he wants. He also said, "I'm not impaired, as you

2

probably already know; if I am then let me know so I don't drive, please." He explained that he would be driving the "Astro" to take his ex-wife home. He said that while on their way back to the impound lot, she bought them a couple of Teas in South Portland and they drank them in the vehicle while driving back. It was not clear how many ounces he consumed. Mr. Rawstron also stated that sometime that afternoon he consumed a nip bottle of Fireball whiskey that he purchased at RSVP in Portland. When asked how he would rate himself on the scale of 1-10, "1 being completely sober with no impairment and 10 being falling down black out drunk," Mr. Rawstron said, "I wish I was at a 10, but I'll say a 1." *Video* at 17:15-19:25.

After a few unrelated questions by another officer, Officer Armstrong arrested Mr. Rawstron for OUI. *Video* at 21:59. In preparing to transport Mr. Rawstron to the South Portland Police Department, Officer Armstrong asked Mr. Rawstron a series of routine booking questions, including whether his ex-wife could drive his vehicle home from the impound lot. None of these questions resulted in any incriminating responses. *Video* at 21:50-26:30.

Mr. Rawstron and Officer Armstrong engaged in some brief conversation during the drive back to the Police station. In response to an inaudible statement or question, Officer Armstrong stated, "Your eyes were the most telling."

Upon arrival at the Police station, Mr. Rawstron was directed to sit in a chair in the intoxilizer room. His hands were secured behind his back. Mr. Rawstron asked if he could be put in a jail cell and have the hand cuffs removed. Officer Armstrong explained that he could not do that until the test was completed. He then explained that he was going to check Mr. Rawstron's mouth and that he should not burp during the observation period. Most of the conversation during the observational period was initiated by Mr. Rawstron and was congenial.

When the observation period was almost over, however, Officer Armstrong asked Mr. Rawstron if he had ever taken a breathalyzer before. Video at 58:38. Mr. Rawstron answered that he had not. He then talked about an incident in Florida and Officer Rawstron asked his "What did you get blamed for?" Mr. Rawstron replied, "for hitting my wife, which I did not do." He went on to describe his jail experience. Officer Armstrong asked several other questions. He also adapted the handcuffs, putting on a second pair, to relieve Mr. Rawstron's discomfort. Both men were respectful and pleasant.

3

## CONCLUSIONS OF LAW

### I. REASONABLE ARTICULABLE SUSPICION

The Fourth Amendment to the United States Constitution and Article I, Section 5 of the Maine Constitution protect motorists from being unreasonably detained by police. *See State v. LaForge*, 2012 ME 65, ¶ 8, 43 A.3d 961. For a detention to be constitutional, "a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984 (footnote omitted). "The officer's suspicion that any of these circumstances exists must be objectively reasonable under the circumstances." *Id.* The only requirement the Law Court has imposed on the reasonable articulable suspicion standard is that the officer's suspicion "be more than mere speculation or an unsubstantiated hunch." *State v. Porter*, 2008 ME 175, ¶ 9, 960 A.2d 321.

In *State v. Sampson*, the Law Court held that an officer had reasonable articulable suspicion to justify detaining a vehicle based on an "anonymous tip" that an intoxicated driver had just been through the drive-in window at Dunkin' Donuts. 669 A.2d 1326, 1327 (Me. 1996). "The tip contained specific information which included a description of [the Defendant's] car, its location, the direction in which it was heading, and the license plate number." *Id.* at 1328. The detaining officer was able to corroborate the tip "by locating a car matching the description in close proximity to the area where it had been reported within two minutes of receiving the information." *Id.* The Court held that this corroboration was sufficient to furnish the officer with reasonable articulable suspicion that the Defendant was engaged in criminal activity and justify the stop. *Id.*

Here, Officer Armstrong's detention of the Defendant was more precise than the one observed in *Sampson*. The call made to dispatch was not anonymous. The call was made by Curtis Gleason of Intown Towing. Mr. Gleason reported, among other things, that a tow truck driver was driving while intoxicated. Mr. Gleason stated that he had arranged for a flatbed tow truck from Ocean Street Towing to tow a car, but the car owner refused to allow the car to be towed because the tow truck driver, "Clayton," appeared to be drunk. Mr. Gleason advised that he had called and talked with Clayton on the phone and confirmed that he sounded intoxicated. Mr. Gleason said that Clayton was now driving the flatbed tow truck to the vehicle impound lot at 33 Rigby Road.

4

Officer Michael Armstrong was dispatched to 33 Rigby Road and found a flatbed tow truck from Ocean Street Towing parked in front of the impound lot. He stopped his vehicle behind the parked flatbed. He approached the man standing in front of the tow truck, who was wearing a shirt with the name "Clayton" printed on the front. The man identified himself as Clayton Rawstron. He also identified the woman in the vehicle as his ex-wife, whom he'd been "driving around." *Video* at 00:45-01:25.

Officer Armstrong advised Mr. Rawstron that the police had received a report from a customer that "Clayton" was driving while under the influence of alcohol. Mr. Rawstron stated that he "cracked a tea on the way home," and drank it within the last half hour while driving to the impound lot. (Twisted Tea is an alcoholic drink). Mr. Rawstron stated he had just arrived at the lot and had not consumed any alcohol since then. *Video* at 01:20 -02:03, 03:00-03:40. Officer Armstrong observed that Mr. Rawstron's eyes were blood shot and glassy, his speech was slurred, he was unsteady on his feet, and he staggered as he walked.

As such, Officer Armstrong had reasonable articulable suspicion to detain the Defendant for the purpose of determining whether the Defendant posed a risk to public safety or to the Defendant himself.

## II.    REASONABLENESS OF THE DURATION OF THE STOP

Having established reasonable articulable suspicion to detain the Defendant for the purpose of determining whether the Defendant posed a risk to public safety or to the Defendant himself, a law enforcement may detain a motorist for as long as reasonably necessary to address the concerns at hand and to issue a summons or warning. *Rodriguez v. United States*, 575 U.S. 346 (2015). Based upon the report from dispatch and his own observations outside the impound lot at 33 Rigby Road, Officer Rawstron reasonably concluded that it would be appropriate to administer FSTs. Having reviewed the body cam video and considering the totality of the circumstances – including the interactions with the Defendant, his answers and explanations to simple questions posed by law enforcement, instructions on how to complete the FSTs, and Defendant's efforts to complete the tests as instructed – the court concludes that the roadside investigation was conducted appropriately and in a reasonable period – a total of 21 minutes.

III. WHETHER THE DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION WITHOUT THE BENEFIT OF *MIRANDA*.

With respect to Defendant's *Miranda*-based challenge, "[i]n order for the statements made prior to a Miranda warning to be admissible, the State must prove, by a preponderance of the evidence, that the statements were made while the person was not in custody or was not subject to interrogation." *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247 (emphasis in original). The appropriate analysis for this determination is set forth in *State v. Dion*, 2007 ME 87, ¶ 23, 928 A.2d 746, in which the Law Court explained: A person not subject to formal arrest may be "in custody" if "a reasonable person standing in the shoes of [the defendant would] have felt he or she was not at liberty to terminate the interrogation and leave" or if there was a "restraint on freedom of movement of the degree associated with a formal arrest." *State v. Holloway*, 2000 ME 172, P14, 760 A.2d 223, 228 (citation and quotation marks omitted). This test is an objective one, and we have stated that in analyzing whether a defendant is in custody, a court may consider the following factors:

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

(citing *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222). *See also State v. Williams*, 2011 ME 36, 15 A.3d 753 (applying above-listed factors in totality in determining that defendant was not in custody at the time of police interrogation).

For the purposes of *Miranda*, "custodial interrogation" includes "both express questioning, and also words or actions that . . . [have] the force of a question on the accused . . . reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).

Applying the factors set forth by the Law Court for assessing whether Defendant was "in custody" at the time his statements were made, the court finds as follows:

There is no question that Defendant was in custody and did not have the benefit of *Miranda*. Defendant was stopped and questioned by Officer Armstrong and another officer at the impound lot. He was required to engage in FSTs. A reasonable person in Defendant's place would clearly not feel at liberty to leave.

At the conclusion of the tests, Defendant was placed under arrest and handcuffed with his hands behind his back. He was taken to the South Portland Police Department, with at least one and sometimes two officers present. For the greater part of the detention, however, there is also no evidence of an interrogation of Defendant. Officer Armstrong's conversation with Defendant at the police station was in response to Defendant's comments about "stupid laws," items on the wall in the room, his tow truck work, how much he was paid, and questions about Class A vehicles. The conversation on the part of the Officer and Defendant was general, pleasant, congenial and an interrogation.

As the observation period was coming to an end and Officer Armstrong was explaining how he would be administering the breath analysis test, he asked Mr. Rawstron, "Have you done a breathalyzer before?" *Video* at 58:38. While perhaps unintended, the court concludes that this question was "reasonably likely to elicit an incriminating response." Indeed, Mr. Rawstron continued the conversation by talking about an incident in Florida and Officer Armstrong asked, "What did you get blamed for?" and Mr. Rawstron answered and talked about doing time in jail. While it is unlikely these questions and responses would be determined admissible at a trial, the court nevertheless concludes that those *statements* made by Mr. Rawstron after 58:38 were the in response to questions reasonably likely to elicit an incriminating response and, as such, shall be suppressed.

Accordingly, Defendant's Motion to Suppress based on the assertion that the Officer lacked reasonable articulable suspicion to conduct the stop is DENIED. The Defendant's Motion to Suppress that the stop was unreasonably extended is DENIED. The Defendant's Motion to Suppress that he was subject to custodial interrogation without benefit of *Miranda* is GRANTED with respect to *statements* made after being asked, "Have you done a breathalyzer before?" *Video* at 58:38. The results of the breathalyzer test are not subject to suppression and are admissible.

The Clerk is directed to incorporate this Order by reference on the docket.

October 20, 2023

_____
MaryGay Kennedy, Justice
Maine Superior Court

8